UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ELIZABETH OWUOR,<br><br>                Plaintiff,<br>    -against-<br><br>NETFLIX, INC.,<br><br>                Defendant. | **Case No.:**<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Elizabeth Owuor ("Plaintiff"), by her attorneys, Mesidor, PLLC, against Netflix, Inc. ("Defendant" or "Netflix"), alleges upon knowledge as to herself and her own actions and upon information and belief as to all other matters as follows:

### PRELIMINARY STATEMENT

1.  Netflix, a company that has publicly boasted about its inclusive and accessible work environment, fosters a workplace culture where discrimination and retaliation run rampant. Behind the closed doors of one of the most well-known streaming services, Netflix has allowed its white and male employees to treat Black and female employees as less than human, all while profiting from their labor and image. Compounding this racism and sexism is unfettered ableism and retaliation against employees who exercise their rights. Netflix, which drew in top talent by promising employees a transparent and accommodating work environment through promises like year-long parental leave, has consistently placed profit, greed, and maintaining harmful and oppressive power structures over the wellbeing, safety, and legally protected rights of employees who are members of marginalized communities. [1]

---

[1] Jessica Toonkel, *Netflix's Extraordinary Parental Leave Was Part of Its Culture. That's Over.*, Wall St. J. (Dec. 12, 2024), https://www.wsj.com/business/media/netflix-unlimited-parental-leave-roll-back-culturea962f50e?st=DYUWJM&reflink=desktopwebshare_permalink ("Since then, several former employees told

2.     Racism, sexism, and ableism are systemic issues at Netflix, issues that the company is well aware of but refuses to correct. It is well-known within Netflix that Black employees experience worse outcomes relative to their white peers, which is disproportionate to their representation within the organization. Black employees receive raises and promotions at lower rates than their white peers and are fired or exited at higher rates relative to their representation within the population. This permeates all aspects of employment and most significantly impacts Black female employees. For example, Netflix disproportionately places white and male employees at higher levels and pay.  Because of this, another Black female colleague informed Plaintiff that she told her manager, "No one at that level looks like me, so I'm finding it hard to picture myself ascending to such a position at this company."

3.     Meanwhile, Netflix permits and even praises the discriminatory and concerning behavior of male employees. One particularly troublesome example is Steve Johnson ("Mr. Johnson"), the Vice President of Design at Netflix. Plaintiff witnessed Mr. Johnson's behavior firsthand and heard stories of problematic behavior by Mr. Johnson and other executives from her peers. For example, in May 2024, during a team onsite, Mr. Johnson made a sexually suggestive comment about Jenna Ortega, the star of Netflix's series "Wednesday," which visibly repulsed the more than one hundred employees in the room. Although human resources representatives were present, no one intervened. On another occasion, Plaintiff witnessed Mr. Johnson physically wrap his arms around a female

the Journal they felt uncomfortable speaking out on their concerns about diversity or racism and were wary of attending meetings of minority-employee resource groups. . . Amy Reinhard, Netflix's then-head of production, acknowledged this issue, specifically for Black employees, in an internal memo last year. She said such experiences are "unacceptable" and outlined steps she was taking, including holding quarterly roundtables between herself and Black employees in the U.S. and Canada.")

colleague on his team in a hug from behind; she was visibly uncomfortable, and her body language indicated that this contact was unwanted. It was clear that Mr. Johnson was not afraid to abuse his power when it came to referencing women sexually or physically touching his own female employees. In May 2024, a female colleague at Netflix indicated to Plaintiff she had seen romantically or sexually explicit texts that Mr. Johnson had sent to a former lower-level employee whom he wanted to date. This female colleague later mentioned the other woman to Mr. Johnson and said, "I believe you know her too, right?" In the midst of a Company-wide meeting, he immediately became awkward, denied knowing the woman, and walked away from Plaintiff's colleague. This kind of behavior by a person in a position of power signaled to other employees that bad behavior was tolerated, celebrated, or overlooked. It also indicated to Plaintiff that reporting bad behavior would put her out of step with a culture that welcomed it.

4.    Importantly, Netflix repeatedly tolerated Mr. Johnson's predatory behavior in public forums and in front of other employees. This open tolerance of blatantly misogynistic and inappropriate behavior indicates a wider tolerance of systemic discrimination at Netflix. Not only does this contribute to a harmful work environment for employees at Netflix, but it indicates that, behind closed doors, discriminatory behavior only gets more severe and pervasive.

5.    Throughout Plaintiff's time at Netflix, she noticed a culture where employees were encouraged to turn the other cheek when witnessing bad and often illegal behavior by others. Victims of discrimination are discouraged from speaking up, and witnesses are discouraged from standing up for others. Netflix uses intimidation and retaliation to silence

employees. Meanwhile, the perpetrators of discrimination are praised, promoted, and permitted to continue engaging in this unlawful conduct.[2]

## NATURE OF THE CASE

6.    Plaintiff complains pursuant to the race discrimination and anti-retaliation provisions of: (i) **Section 1981 of the Civil Rights Act of 1866**, 42 U.S.C. § 1981 ("Section 1981"); and (ii) any other claim(s) that can be inferred from the facts set forth herein and seeks damages to redress the injuries Plaintiff suffered as a result of being subjected to unlawful discrimination and retaliation by Defendant.

## JURISDICTION AND VENUE

7.    The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §1331, as this action arises under 42 U.S.C. § 1981.

8.    The Court has supplemental jurisdiction over all state law claims pursuant to 28 U.S.C. § 1367.

9.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1), as Defendant resides within this judicial district.

## PARTIES

10.    Plaintiff is a resident of the State of California.

11.    At all times material, Plaintiff was a "person" and entitled to protection as defined by Section 1981.

12.    At all times material, Defendant was and is a corporation formed under the laws of the State of Delaware.

---

[2] For example, after Plaintiff's termination, Netflix promoted at least two perpetrators of discrimination referenced in this Complaint, including Devi Srinivasan and Amber Cartwright, despite their discriminatory behavior.

13.     Defendant maintains a substantial presence within this judicial district. Defendant's New
        York, New York office is home to its Content, Advertising, Marketing, Production, Legal
        and Human Resources teams.

## MATERIAL FACTS

14.     Plaintiff, a Black content designer, author, copywriter and journalist, with more than 15
        years of experience in her field, was hired by Defendant on August 31, 2020, as a Content
        Designer. In or around November 2021, Plaintiff was promoted to Senior Content
        Designer.

15.     As a Senior Content Designer, Plaintiff used language to create user-centric experiences
        across several different "products" for the Company. The role required Plaintiff to
        collaborate with Executives, fellow Designers, Product Managers, Engineers, Researchers,
        and other cross-functional team members to provide clear, concise language that guided
        users through the Netflix experience. Plaintiff provided this kind of content strategy and
        writing expertise for a variety of different audiences around the world, reaching millions
        of users.

16.     Throughout her tenure with Defendant, Plaintiff consistently performed well by every
        objective metric. For example, in April 2021, Plaintiff received her first round of
        performance reviews, wherein her colleagues gave her overwhelmingly positive feedback.
        Plaintiff's colleagues commended her for her dependability, for onboarding quickly and
        seamlessly, demonstrating strong communication and presentation skills, and working
        collaboratively and building relationships cross-functionally, among other positive
        feedback. Some specific feedback included: "[Plaintiff] is passionate about her discipline,
        what she can contribute to our team, and how she can solve problems for users. Her

enthusiasm is contagious. She's already won over our cross-functional partners with her passion for Content Design." "In just a few months, you've led initiatives and created artifacts that will drive a ton of wider impact, and help people contribute more effectively." "You've onboarded and developed a working process without a blueprint as our team's first Content Designer. This isn't an easy feat." "You're excellent at both verbal and visual communication). [sic] Your presentations are always thorough, clear, and effective at communicating your intention."

17.     In June 2023, Plaintiff received her second round of formal performance feedback with similar praise from her colleagues. More recently, in or around December 2023 and January 2024, Plaintiff contributed to a project that brought Defendant multiple millions of dollars in revenue and was so successful that Defendant's executives cited the project's success at a company-wide meeting in January 2024.

18.     During the most recent review cycle, Plaintiff also received positive feedback, despite her supervisor's retaliatory attempt to solicit negative feedback about her, detailed below.

19.     Unfortunately, despite consistently exceeding its performance expectations, Netflix intentionally discriminated against Plaintiff based on her race.

20.     Almost immediately upon beginning her tenure at Netflix, Plaintiff noticed that, although Netflix is a company that publicly touts ideals of diversity and inclusion, Netflix had built a company culture and work environment deeply rooted in racism. Netflix treated Black employees, like Plaintiff, much worse than their non-Black counterparts, and Black employees were subject to constant racial microaggressions, othering, ostracization, and tokenization. Plaintiff noticed this from a Company-wide standpoint and from how her

manager, Jen Schaefer ("Ms. Schaefer"), the Director of the Content Design team, who is white, treated Plaintiff compared to her non-Black peers.

21.    As soon as Plaintiff started working for Defendant, Ms. Schaefer repeatedly made racially charged comments about her hair. Among other coded language, she commented that Plaintiff's hairstyle and texture were "different."

22.    These racist microaggressions made Plaintiff extremely uncomfortable and she was deeply upset that her supervisor had immediately alienated her from her peers based on her race.

23.    Upon information and belief, Ms. Schaefer also made discriminatory and uncomfortable comments about one of Plaintiff's Black female colleague's hair. Ms. Schaefer did not make these comments towards Plaintiff's non-Black peers.

24.    On several occasions, Ms. Schaefer also undermined Plaintiff's experience and intelligence in front of others. For example, early into Plaintiff's tenure, Ms. Schaefer humiliated Plaintiff and insulted her by referring to her as a "noob" in a team-wide email despite Plaintiff's years of experience in the field.

25.    Ms. Schaefer did not similarly discredit Plaintiff's non-Black peers, even if they were new to the Company or had less experience than Plaintiff.

26.    Throughout Plaintiff's tenure, Ms. Schaefer constantly reminded Plaintiff that she was the "other" through repeated, racist microaggressions. For example, during a team onsite in Los Angeles, CA, in May 2024, Ms. Schaefer again commented on Plaintiff's hair in a racist and othering way and then physically touched her hair without her consent.

27.    Netflix also repeatedly subjected Plaintiff to racist microaggressions and stereotypes, which created different conditions of employment compared to Plaintiff non-Black peers, such as heightened performance standards. For example, Netflix repeatedly characterized

Plaintiff's actions within the "angry Black woman" trope. When Plaintiff voiced her opinion or made suggestions, non-Black employees often accused her of being "too assertive" or "too aggressive." Plaintiff's non-Black peers who voiced their opinions did not face similar criticism and were often praised or rewarded for their candor.

28.    Similarly, Defendant encourages employees to defend strong opinions with vigor and to have a strong viewpoint. Despite this guidance, a white male colleague, Derek Collins ("Mr. Collins"), referred to Plaintiff as "defensive" in her performance review because she defended her point of view on research she had conducted. While Defendant commended non-Black employees, and especially white men, who presented strong viewpoints as confident, it labeled Black employees, and especially Black female employees, who presented strong viewpoints as aggressive.

29.    Netflix further permitted male employees to speak down to Plaintiff and degrade her intelligence openly and without cause. For example, in June 2024, a male product director, Brady Gunderson ("Mr. Gunderson"), who often spoke down to Plaintiff, told her, unprompted, "If you don't understand something, say something." Plaintiff had never indicated a lack of comprehension about any topic related to her work and her work performance and quality demonstrated that she was a capable and knowledgeable employee. Mr. Gunderson did not hurl similar insults toward Plaintiff's white colleagues.

30.    Around the Summer of 2023, the Design Manager, Amber Cartwright ("Ms. Cartwright"), a white woman, began treating Plaintiff, the only Black employee on their team, differently and worse than her non-Black peers.

31.    For example, although Ms. Cartwright and Plaintiff had a recurring 1:1 meeting, she immediately began escalating negative feedback to Plaintiff's manager, Tracey Watson

("Ms. Watson"), instead of directly to Plaintiff. Ms. Cartwright ignored Plaintiff's accomplishments to highlight purported flaws, and demanded that Plaintiff send her weekly updates each Monday about her projects. This was notably concerning because Ms. Cartwright was not Plaintiff's manager, and their entire team had weekly Monday meetings to share updates. In other words, there was no legitimate reason why Plaintiff needed to update Ms. Cartwright individually. Plaintiff was the only Black team member, and the only team member Ms. Cartwright treated this way.

32.    Ms. Cartwright's discriminatory behavior was so glaring that Plaintiff's colleagues noticed and commented on it to Plaintiff. In October 2023, one of Ms. Cartwright's white direct reports indicated that she saw the racism directed at Plaintiff by her manager and that she believed Ms. Cartwright treated Plaintiff this way because she was not "deferential" enough to Ms. Cartwright.

33.    On multiple occasions during October 2023, Plaintiff spoke to her manager, Ms. Watson, about Ms. Cartwright's disparate treatment of her. For example, on October 2, 2023, Plaintiff met with Ms. Watson and explained she was concerned about Ms. Cartwright prematurely escalating feedback to Ms. Watson without giving Plaintiff any chance to respond to or incorporate her feedback. Plaintiff shared that she felt Ms. Cartwright was attempting to intimidate her and that it was antithetical to Netflix's purported values of providing direct feedback.

34.    On October 6, 2023, Plaintiff spoke to Ms. Watson about her concerns again. Plaintiff expressed that she felt Ms. Cartwright was bullying her and that Ms. Cartwright treatment of her was exhausting to navigate.

35.    Plaintiff's conversations with Ms. Watson were confusing and frustrating. On the one hand, Ms. Watson acknowledged that there were "racist undertones" to Ms. Cartwright's policing and feedback towards Plaintiff, but on the other hand, Ms. Watson used the feedback against Plaintiff. This shift was most evident after Plaintiff asked Ms. Watson how she could support Plaintiff and protect her from racially motivated harm. After this, Ms. Watson began placing last-minute meetings on Plaintiff's calendar to discuss Ms. Cartwright's negative feedback about Plaintiff, which caused Plaintiff to experience significant anxiety and sleepless nights, which required medical treatment. Plaintiff struggled to understand how Ms. Watson could first acknowledge that Ms. Cartwright's feedback and conduct were racist but then justify using that feedback against Plaintiff while perpetuating Ms. Cartwright's discriminatory treatment toward Plaintiff.

36.    On October 10, 2023, Plaintiff spoke directly to Ms. Cartwright about how she felt Ms. Cartwright was treating her differently than her peers. Plaintiff expressed her disappointment that Ms. Cartwright had not given her feedback directly. Plaintiff expressed her concern that Ms. Cartwright's treatment toward her did not align with Netflix's core values of delivering timely and direct feedback, while also pointing out how Ms. Cartwright's conduct had negatively impacted her. Specifically, Plaintiff felt that Ms. Cartwright's decision not to share her feedback directly was detrimental to building a cross-functional partnership and did not allow Plaintiff to address her concerns in a way that honored their 1:1 working relationship. Plaintiff also expressed that only learning of Ms. Cartwright's concerns through her manager made her question why she did not provide feedback to her directly. Finally, Plaintiff requested that Ms. Cartwright provide direct feedback to her moving forward, in keeping with Netflix's stated values.

37.   Around the end of October or the beginning of November 2023, Ms. Watson falsely claimed that "all" of Plaintiff's partners were sharing negative feedback about her, not just Ms. Cartwright, and that Plaintiff's employment was at risk. This sudden feedback was in stark contradiction to Plaintiff's overwhelmingly positive reviews and feedback, and none of her partners had communicated any concerns to her.

38.   When Plaintiff asked Ms. Watson to provide support for her claims of negative feedback, Ms. Watson was wholly unable to cite to any specific examples of these purported concerns.

39.   Plaintiff subsequently reached out to two partners with whom she regularly worked, Avi Naim ("Mr. Naim") and Heather Noddings ("Ms. Noddings"), who both informed her that Ms. Watson had never spoken to them about her performance. Mr. Naim and Ms. Noddings were also so surprised that they reached out to Ms. Watson directly, but she never responded to their messages.

40.   On November 7, 2023, Plaintiff contacted Ms. Watson over Slack to further discuss her concerns. Plaintiff told Ms. Watson that two of her design partners denied ever speaking to Ms. Watson about Plaintiff's performance and further denied having any negative feedback about Plaintiff.

41.   Additionally, Plaintiff also explained that she felt Ms. Cartwright's mistreatment and bullying of her was solely related to her race and noted that Ms. Watson had previously acknowledged there were racial "undertones" in how Ms. Cartwright had treated her. Finally, Plaintiff conveyed that Ms. Watson's treatment of her had caused her significant stress and anxiety, triggering health concerns. Plaintiff told Ms. Watson that she likewise

felt that Ms. Watson's conduct had adopted the same racist "undertones" as Ms. Cartwright's conduct.

42.     Around this same time, Plaintiff reached out to Ms. Schaefer to document her concerns about racial discrimination. She told Ms. Schaefer that Ms. Cartwright's and Ms. Watson's conduct had made her extremely uncomfortable as a Black woman and informed Ms. Schaefer that Ms. Watson had lied about receiving negative feedback about Plaintiff to threaten her employment.

43.     Acknowledging that Ms. Schaefer had previously recommended Plaintiff speak to Human Resources about her complaints, Plaintiff asked Ms. Schaefer who she should speak to in Human Resources. Plaintiff and Ms. Schaefer agreed to meet to speak about this issue in early November 2023.

44.     On November 13, 2023, Plaintiff messaged Ms. Schaefer on Slack to reiterate her concerns about race discrimination as well as to express that she was concerned that Ms. Watson, who was perpetuating racial discrimination, was positioned to decide whether she would receive an annual raise.

45.     Just one day after Plaintiff communicated her concerns about racism to Ms. Schaefer in writing, Ms. Schaefer notified Plaintiff that Defendant had denied her a raise.

46.     Thereafter, in November 2023, Plaintiff escalated her concerns about race discrimination to Geo de Silva, ("Mr. de Silva") from Human Resources.

47.     Plaintiff explained to Mr. de Silva that it was deeply distressing that Ms. Watson had first acknowledged Ms. Cartwright was exhibiting racial bias against Plaintiff, but then began to perpetuate that bias herself, to the point of threatening Plaintiff's employment under false pretenses after she complained about discrimination.

48.    Instead of focusing on Plaintiff's explicit concerns about race discrimination, Mr. de Silva interrogated Plaintiff about the feedback Plaintiff received in a dismissive and insensitive manner. It was evident that Mr. de Silva was blaming Plaintiff for the racism she experienced as though she was the subject of the complaint. Plaintiff expressed this very concern to Mr. de Silva and asked how Defendant would address the racism she experienced, but he did not provide any clarification.

49.    In or around November or December 2023, Ms. Schaefer transferred Plaintiff to a different team so that Plaintiff would stop reporting to Ms. Watson, and instead work under Devi Srinivasan ("Ms. Srinivasan"), Senior Manager of Content Design, who had previously shared Plaintiff's medical condition and need for leave in mid-2022 with several of Plaintiff's peers without Plaintiff's consent.

50.    It was clear that Netflix had set Plaintiff up to fail in her new role, based on her race and in retaliation for her complaints. In her new role, Plaintiff was forced to complete the workload of two people because her role encompassed responsibilities that would usually be divided between two separate employees.

51.    In December 2023, as Plaintiff was speaking with Ms. Schaefer and Ms. Srinivasan about the racism she had been subjected to by Ms. Watson, she became overwhelmed with tears. Instead of acknowledging that Plaintiff's experiences of racism under Ms. Watson were painful and traumatic, Ms. Schaefer said that she did not believe Plaintiff, and Ms. Srinivasan later indicated that she felt Plaintiff's emotions were attributable to Plaintiff's past medical leave (from more than a year prior) and trauma, although Plaintiff had never indicated that to her. Not only did she invalidate Plaintiff's experiences of racism, but her unprompted mention of Plaintiff's past medical leave made it clear that she still held a

grudge against Plaintiff for taking medical leave, and that she viewed Plaintiff as less capable because of her perceived disability.

52.    Beginning in or around February 2024, Plaintiff learned that Ms. Srinivasan and Design Manager Leona Hudelson ("Ms. Hudelson") were hunting for negative feedback against her from her peers and design partners in retaliation for her complaint of discrimination. At least two colleagues notified Plaintiff that Ms. Srinivasan and/or Ms. Hudelson had approached them to request feedback about Plaintiff. One of Plaintiff's partners, who had been with the Company for over ten years, called a meeting with Plaintiff to inform her that he felt this was a red flag and that Ms. Hudelson seemed to be attempting to push him to give negative feedback about Plaintiff, but he informed her that he enjoyed working with Plaintiff.

53.    This is a well-known pattern within Netflix. When the company is gearing up to terminate someone's employment, especially without a legitimate reason, their manager sends signals by suddenly requesting negative feedback about the employee.

54.    In or around March or April 2024, another Black female colleague reported Ms. Srinivasan to several Netflix executives for racial discrimination after she began feeling ostracized and targeted by her and other non-Black employees. This colleague noted that, when trying to manage the situation, Ms. Srinivasan said, "Well, I wasn't born Black. I'll never be Black." This comment was documented and relayed to Ms. Srinivasan's leaders. Plaintiff's colleague also confided in her that other Black employees in Experience Design (XD) had experienced similar racism across the organization and had reported it to management.

55.    Around this same time, in March or April 2024, it was clear that Ms. Srinivasan was nervous about complaints of racial discrimination against her. Not because she cared to

learn or do better, but because she did not want to be held accountable. Plaintiff noticed that Ms. Srinivasan began unilaterally shifting the focus of their one-on-one meetings to race, even though Plaintiff had never indicated she wanted to have a conversation about race. Ms. Srinivasan repeated the statement to Plaintiff that she had communicated to Plaintiff's Black female colleague, namely, "Well, I wasn't born Black. I'll never be Black."

56.    Ms. Srinivasan further indicated she did not understand Blackness, race, or inclusion. Plaintiff responded that it was part of Ms. Srinivasan's responsibilities as a manager to understand these dynamics and show up better for her marginalized direct reports.

57.    Plaintiff also shared that she noticed Ms. Srinivasan's inability to handle conversations about race and to support her Black direct reports and Plaintiff expressed that she felt Ms. Srinivasan could work on it. Then, Ms. Srinivasan asked Plaintiff for research references on racism. If Ms. Srinivasan was truly committed to being an ally to Black people and becoming anti-racist, she could have conducted this research herself without asking Plaintiff, a Black woman, to endure the mental and emotional burden of educating her on racism. Ms. Srinivasan was evidently more concerned about appearing inclusive than actually putting in the work to learn and do better.

58.    Around the end of June 2024, Ms. Srinivasan denied Plaintiff additional support in her role after Plaintiff explained she was performing the work of two employees and requested Defendant hire someone to support her work. Ms. Srinivasan stated that additional support was not available, but if any support were to arise, it would be given to a team that was not Plaintiff's focus, rather than Plaintiff.

59.    On June 29, 2024, Plaintiff submitted her official 360 Feedback about Ms. Watson and Ms. Cartwright. Plaintiff explained that she felt Ms. Watson had subjected her to racial bias and Ms. Cartwright had subjected her to racial bullying.

60.    Plaintiff provided specific examples in her feedback about both women and noted that the experience was traumatizing and impacted her well-being. Plaintiff further explained that she hoped her feedback would protect other individuals from future harm under Ms. Watson's and Ms. Cartwright's leadership.

61.    On July 1, 2024, Khalil Williams ("Mr. Williams") from Human Resources requested to meet with Plaintiff about the 360 Feedback she left for Ms. Watson and Ms. Cartwright. He questioned why Plaintiff had put such feedback in writing. Plaintiff explained that submitting feedback was a Netflix core value, and that she did not wish to meet because revisiting the traumatic experience would negatively impact her mental health. Plaintiff also pointed to the demoralizing conversation she had about her experience with Human Resources in the fall.

62.    Mr. Williams continued to push for a meeting, which included sending several Slack messages. He even went as far as placing a meeting on Plaintiff's calendar, even though Plaintiff had rebuffed his requests for a meeting via Slack. He did not relent until Plaintiff informed him that her medical professionals had advised her it would be best for her health to decline the meeting. This experience indicated that Netflix was not happy with Plaintiff's submission of honest feedback, despite its claim that direct and honest feedback was a core value.

63.    Around the same time, Plaintiff was shocked to learn from another Black colleague (who was uninvolved) that Mr. Williams mentioned her situation to Plaintiff's colleague and that

he was "trying to reach [Plaintiff]." It was apparent to Plaintiff that Netflix was attempting to strongarm her into a conversation with Human Resources, which had already proven damaging to her well-being.

64.   Around the end of July 2024, Plaintiff met with Ms. Schaefer, who prompted a discussion about Plaintiff's experiences of racial discrimination. Plaintiff told Ms. Schaefer that the way she handled Plaintiff's earlier complaint of discrimination and how she discounted Plaintiff's experiences was very harmful. At first, Ms. Schaefer reacted strongly, claiming that what Plaintiff described did not sound like her. However, after Plaintiff reminded her about their December 2023 conversation, she acknowledged that she had denied Plaintiff's claims. Unfortunately, this conversation did not lead to any positive change at Netflix,

65.   The challenges that Black Content Designers faced at Netflix was so widely discussed at the company among Black employees and leadership that Ms. Schaefer had brought it up to Plaintiff and multiple other Black team members at Netflix.

66.   However, it was clear that Ms. Schaefer did not know how to appropriately address these issues. One team member heard that she asked, "what's going on with all the Black Content Designers?", seeming to blame the victims of discrimination for what they had endured.

67.   Plaintiff also learned that Ms. Schaefer asked Mr. Williams to conduct a lunch for all of the Black team members for the upcoming team onsite in September. She asked another Black female employee to run a "culture session" after she had experienced racism on the team, putting the emotional and mental labor on the victim of discrimination to teach others, rather than having the company do the work to address the problem head-on.

68.   During one of Plaintiff's last conversations with Ms. Schaefer, Ms. Schaefer asked Plaintiff if she felt that a Black employee lunch would help with "the problem." Plaintiff explained

that she did not think a Black employee lunch would be very helpful because it would not address the systemic and institutional anti-Blackness that was the root cause of the issue at Netflix. Netflix needed to actually hold itself accountable and stop permitting discrimination and anti-Blackness to saturate the company culture.

69.     At the beginning of August 2024, Plaintiff met with Ms. Srinivasan for a one-on-one meeting. This was Plaintiff's first opportunity to meet with Ms. Srinivasan after she returned from a two-week vacation, and she did not hesitate to retaliate against Plaintiff for her complaint of discrimination.

70.     Ms. Srinivasan began the meeting by immediately delving into purported negative feedback about Plaintiff. Plaintiff pushed back, noting that Ms. Srinivasan did not highlight any of the positive feedback she had received from her reviews. In a previous meeting, Ms. Srinivasan even told Plaintiff she was good at her job. In response, Ms. Srinivasan stated, "This isn't about skillset." It was immediately clear that the purported feedback had no basis in reality but was merely a pretext to retaliate against Plaintiff for her complaints of racial discrimination.

71.     During a second conversation at the beginning of August 2024, Ms. Srinivasan suddenly indicated that Plaintiff's job was at risk. Plaintiff was devastated that Netflix was choosing to retaliate against her for speaking out against racism instead of taking steps to address the systemic issue. During their 1:1, Plaintiff documented her concerns about anti-Blackness and racism, among other issues.

72.     On August 7, 2024, Netflix's campaign of racial discrimination and retaliation based on Plaintiff's complaints of racism ultimately culminated in Defendant's decision to terminate Plaintiff's employment for pretextual reasons.

73.    Ms. Srinivasan informed Plaintiff of Defendant's decision to terminate her employment, citing velocity and mentioning her skillset, which directly contradicted her statement less than a week prior. During the call, Plaintiff told Ms. Srinivasan that she felt Defendant was retaliating against her and was engaging in a pattern of harmful racial discrimination against Black employees. Plaintiff also stated that she believed Ms. Srinivasan was actually terminating her employment because she had raised these issues. Finally, Plaintiff pointed out Ms. Srinivasan's conflicting statements about her skillset and noted that it was common knowledge among XD employees at Netflix that another Black employee had recently reported her for racial discrimination.

74.    Netflix has continued to engage in discriminatory and retaliatory practices since the Company terminated Plaintiff's employment.

75.    Specifically, Netflix held a meeting shortly after Plaintiff's termination that included all Black employees in the Product Design organization, Human Resources, and Mr. Johnson to discuss the experiences of Black employees at Netflix. Mr. Johnson led this meeting, and unsurprisingly, did so in a manner that reinforced the racism and misogyny that many employees suffer at Netflix.

76.    For example, Mr. Johnson indicated that, in his opinion, the "worst thing" an individual can be accused of is racism or sexual assault. He did not recognize that it is much worse to actually experience racism or sexual assault. Because the topic of the meeting was about race and not sexual assault, many attendees thought it odd that he brought up the specter of being accused of sexual assault when the meeting was only about racism at Netflix. Furthermore, his focus steered the conversation away from the purported topic at hand– racism at Netflix–to instead focus on the fragility of the accused.

77.  Additionally, during this meeting, a Black employee stated, "Black people have it hard here but Black women have it the worst." To Plaintiff's knowledge, neither Mr. Johnson nor the Human Resources representative had any response to this statement.

78.  Netflix was and is well aware of the systemic racism and misogyny at Netflix, to the point of scheduling meetings to "discuss" these concerns but has not done anything to seriously address the problem. Instead, Netflix has constantly retaliated against employees who dare to speak up.

79.  Racism, anti-Blackness, misogynoir, and retaliation are all part of the workplace culture at Netflix. It is well-known within the Company that Black employees experience worse outcomes relative to their white peers, which is disproportionate to representation of Black employees within the organization. Black employees receive raises and promotions at lower rates than their white peers, and Black employees are fired or exited at disproportionately high levels. When Netflix introduced leveling on the Content Design team, the Company selected only white employees for the highest senior levels and accompanying pay.

80.  As a direct result of Netflix's discrimination and retaliation described herein, Plaintiff has suffered damages including but not limited to loss of income, loss of opportunity for advancement, emotional distress, physical pain, mental anguish, humiliation, and reputational damage.

## FIRST CAUSE OF ACTION
## FOR DISCRIMINATION UNDER SECTION 1981

81.  Plaintiff repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

82.  42 U.S.C. § 1981 states, in the relevant part, as follows:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

83. As described herein, Defendant discriminated against Plaintiff on the basis of her race in violation of Section 1981, by fostering, condoning, accepting, ratifying, and/or negligently failing to prevent or remedy a hostile work environment and terminating her employment.

84. As a result of Defendant's unlawful discriminatory conduct in violation of Section 1981, Plaintiff suffered economic loss, for which she is entitled to an award of monetary damages and other relief.

85. As a result of Defendant's unlawful discriminatory conduct in violation of Section 1981, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, physical pain, and emotional pain and suffering, for which Plaintiff is entitled to an award of monetary damages and other relief.

86. The unlawful discriminatory actions of Defendant constitute malicious, willful, and wanton violations of Section 1981, for which Plaintiff is entitled to an award of punitive damages.

**SECOND CAUSE OF ACTION**
**FOR RETALIATION UNDER SECTION 1981**

87. Plaintiff repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

88. As described herein, Plaintiff engaged in activities protected by Section 1981 by complaining of racial discrimination.

89.    After Plaintiff engaged in protected activities, Defendant retaliated against Plaintiff as described herein.

90.    Defendant would not have terminated Plaintiff, but for Plaintiff's complaints of discrimination.

91.    Such retaliatory treatment would dissuade a reasonable employee from making or supporting a similar complaint of discrimination.

92.    As a result of Defendant's unlawful conduct in violation of Section 1981, Plaintiff has suffered economic loss, for which Plaintiff is entitled to an award of monetary damages and other relief.

93.    As a result of the unlawful conduct of Defendant in violation of Section 1981, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, physical pain, and emotional pain and suffering, for which Plaintiff is entitled to an award of monetary damages and other relief.

94.    The unlawful discriminatory actions of Defendant constitute malicious, willful, and wanton violations of Section 1981, for which Plaintiff is entitled to an award of punitive damages.

## JURY DEMAND

95.    Plaintiff hereby demands a jury trial.

**WHEREFORE**, Plaintiff respectfully requests a judgment against the Defendant:

A.    Declaring that Defendant engaged in unlawful employment practices prohibited by Section 1981 in that Defendant discriminated against Plaintiff on the basis of her race and retaliated against Plaintiff on account of her complaints of racial discrimination;

B.  Awarding damages to Plaintiff for all lost wages and benefits resulting from Defendant's unlawful discrimination and to otherwise make her whole for any losses suffered as a result of such unlawful employment practices;

C.  Awarding Plaintiff compensatory damages for mental, emotional injury, distress, pain and suffering and injury to her reputation in an amount to be proven;

D.  Awarding Plaintiff punitive damages;

E.  Awarding Plaintiff attorneys 'fees, costs, disbursements, and expenses incurred in the prosecution of the action; and

F.  Awarding Plaintiff such other and further relief as the Court may deem equitable, just, and proper to remedy Defendant's unlawful employment practices.

Dated: Bellport, New York
       July 3, 2025

 

**MESIDOR PLLC**

Marjorie Mesidor
30 Station Road, Ste 5
Bellport, NY 11713
(212) 930-6010
mm@marjoriemesidor.com
*Attorneys for Plaintiff*